**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
COLUMBIA DIVISION**

| | |
|---|---|
| Tetra Tech EC/Tesoro Joint Venture, ) | |
| ) | Civil Action No. 3:10-CV-1597-CMC |
| Plaintiff, ) | |
| ) | **OPINION AND ORDER** |
| v. ) | **ON CROSS-MOTIONS FOR** |
| ) | **SUMMARY JUDGMENT** |
| Sam Temples Masonry, Inc., and North ) | |
| American Specialty Insurance Company, ) | |
| ) | |
| Defendants. ) | |
| ———————————————————— ) | |
| ) | |
| Sam Temples Masonry, Inc., ) | |
| ) | |
| Third-Party Plaintiff, ) | |
| ) | |
| v. ) | |
| ) | |
| Safeco Insurance Company of America, ) | |
| ) | |
| Third-Party Defendant. ) | |
| ———————————————————— ) | |

This matter is before the court on motion for partial summary judgment filed by Plaintiff,

Tetra Tech EC/Tesoro Joint Venture ("Tetra Tech") (Dkt. No. 248), and on cross-motions for

summary judgment filed by Defendants, Sam Temples Masonry, Inc., ("STM") and North American

Specialty Insurance Company ("NASIC") (Dkt. Nos. 246, 247). As reflected in the caption, all

claims asserted by or against third parties (and one fourth party) have been dismissed except for

STM's third-party claim against Tetra Tech's surety, Safeco Insurance Company of America. For

the reasons set forth below, the court denies Defendants' motions and grants Plaintiff's motion.

**FACTS**

Tetra Tech was the general contractor for a multi-building drill sergeant training facility at

Fort Jackson, South Carolina ("the Project"). Tetra Tech entered a subcontract with STM to perform

masonry work on the Project ("Subcontract").  NASIC issued a performance bond as surety for STM's obligations under the Subcontract ("Performance Bond").  The U.S. Army Corps of Engineers ("USACE") was responsible for oversight of the Project.

On September 22, 2009, Tetra Tech's representative certified to USACE, that STM's work was complete, noting that STM had already been paid $1,554,673 of the total contract price of $1,575,473.  Dkt. No. 246-3 at 108-16, 109.  More than a month later, Fort Jackson experienced heavy rain and wind.  This storm caused water infiltration into one of the buildings on which STM had performed masonry work.  USACE advised Tetra Tech that it would be required to correct the issues which caused the leak.  Subsequent investigation, including some demolition of interior and exterior walls, revealed deficiencies in construction, including deficiencies in STM's masonry work, most particularly the brick veneer of the building.[1]  *See, e.g.,* Dkt. No. 272-8 (Report dated January 5, 2010).

By letter dated January 11, 2010, USACE's contracting officer for the Project ("Contracting Officer") provided Tetra Tech with a comprehensive list of deficiencies, many of which related to STM's work.  Dkt. No. 272-9.  Thereafter, Tetra Tech, STM, and other subcontractors worked together to prepare a remedial plan which became known as the Corrective Action Plan ("CAP").  *E.g.* Deposition of Jason C. Torbett at 151-52 ("Torbett dep.") (Dkt. No. 272-5 at 8).  STM was in agreement with the CAP.  *Id*. at 152-53; *see also* Deposition of Samuel E. Temples at 106 ("Temples dep.") (Dkt. No. 272-10).[2]

---

[1]  While the extent of the deficiencies and proper remedial course are in dispute, the fact that there were deficiencies is not.

[2]  Jason Torbett and Sam Temples are both agents of STM.  In his deposition, Sam Temples conceded that the CAP would not correct all deficiencies noted by USACE.

The CAP was submitted to USACE on or about January 19, 2010. Dkt. No. 272-11 (Tetra Tech letter forwarding CAP). Within a week, USACE rejected the CAP. Dkt. No. 272-12 ("USACE Directive" dated January 25, 2010). The USACE Directive "directed [Tetra Tech] to remove all brick veneer and all associated cavity wall components [in two buildings], make necessary repairs to correct the deficiencies noted in [USACE's] January 11, 2010 Letter . . . and re-install the cavity wall system in accordance with the . . . original design." *Id.* at 2. It also demanded that the re-work "commence no later than February 16, 2010" and warned that "[f]ailure to correct all identified deficiencies may result in termination for default[.]" *Id.* The USACE Directive included a reminder that liquidated damages of $2,041.94 per day were accruing because the Project was past its October 15, 2009 completion date. Despite the efforts discussed below, the January 25, 2010 USACE Directive was never modified or rescinded. *See, e.g.*, Torbett dep. at 167 (Dkt. No. 272-5 at 9).

On or before January 29, 2010, STM advised Tetra Tech that it would not comply with the USACE Directive, prompting Tetra Tech to send Notice of Cure letters to both STM and NASIC. Dkt. Nos. 272-13, 272-14. The letter to NASIC attached the letter to STM and stated that Tetra Tech was "provid[ing] Notice of a potential claim against" the bond. It summarized the situation, explaining that STM had "been afforded the opportunity to provide input into developing a [CAP]," but that the Client had recently given "written notice . . . that the proposed CAP is not acceptable." The letter then stated:

> STM has not fulfilled the obligations of the referenced Subcontract, and, based upon conversation between Sam Temples and Tetra Tech personnel, we are advised by Mr. Temples that STM may not be willing or able to fulfill [its] obligations under the Subcontract.

3

> As the Surety, and guarantor of Subcontract performance, we are notifying you that STM's failure to comply with the direction provided in the attached letter, may result in termination for default and that Tetra Tech will hold the Surety responsible for all costs and damages directly and indirectly attributable to the successful completion of STM's Subcontract obligations.

Dkt. No. 272-13.

On February 4, 2010, Tetra Tech again wrote to NASIC advising it that STM had "failed to provide a satisfactory response to the [January 29, 2010] cure notice letter," and that this non-response was "in keeping with statements made to Tetra Tech . . . that STM does not intend to comply" with that notice. Dkt. No. 272-15. Tetra Tech, therefore, "declared STM to be in default of the subcontract," made a claim on the bond, and asked "which of the three options provided for in the bond [NASIC] intends to take to remedy STM's failure and to satisfactorily complete the subcontract work." *Id.* (also advising of daily liquidated damages penalty which was accruing until the remedial work was completed).

During the months following Tetra Tech's receipt of the USACE Directive and while Tetra Tech's directive to STM (or NASIC) to complete the work were pending, STM sought to convince USACE to accept a less costly remedy. *See, e.g.*, Dkt. No. 272-16 (March 30, 2010 letter to STM and NASIC stating that "Tetra Tech has cooperated with the efforts of STM to seek relief from [the USACE] directive"). These efforts included proposing alternative solutions and meeting with USACE representatives on March 19, 2010. *Id.* On March 30, 2010, Tetra Tech informed STM and NASIC that it had "been informed by USACE that they are unhappy with the failure to begin removal and replacement of the masonry" and that Tetra Tech did not believe the alternative proposals would be accepted. Tetra Tech, therefore, "again declare[d]" STM to be in default and "call[ed] on STM and its surety to proceed with the removal and replacement of the masonry." *Id.*

Tetra Tech explained ,"[t]his work should begin as close to immediately as possible. Any other course of action will risk default of Tetra Tech's construction contract with USACE." *Id.* Tetra Tech, nonetheless, expressed a continued willingness to pass on information which might lead to withdrawal of the directive to remove and replace the brick veneer, and noted that it had advised USACE that if the USACE Directive, in fact, turned out to be over-reaching, Tetra Tech would cooperate with STM in pressing a claim for the cost of the work. *Id.* at 3. Tetra Tech closed by asking NASIC and STM to "confirm by close of business on Friday April 2, 2010 that removal and replacement . . . will be undertaken by STM and advise when you intend to begin this work." *Id.*

On April 6, 2010, Tetra Tech again wrote STM, with a copy to NASIC, responding to an April 1, 2010 request by STM for issuance of a change order request. Dkt. No. 272-17; *see also* Dkt. No. 272-19 (change order request). According to this letter, STM was presenting two alternative change orders, one for applying a sealant (seeking $379,737), and one for removing and replacing the brick veneer (seeking over $2 million). Tetra Tech rejected the first alternative, in part because it was work STM had previously asked USACE to accept (at no cost to USACE) as the less expensive cure for deficiencies in STM's masonry work. Tetra Tech also rejected the second alternative, noting the amount sought was the "pricing for the entire scope of work [required by the USACE] Directive," and that even if the USACE Directive required more than was necessary, it did not justify seeking a change order for the entire cost as STM acknowledged some corrective work was needed. *Id.* Tetra Tech, nonetheless, advised STM that, if "STM move[d] forward on the Directive, [Tetra Tech] will support a claim against USACE for the difference between the work STM believes is warranted and the work now being required by USACE." *Id.*

On April 16, 2010, STM submitted a claim to Tetra Tech for additional costs and time required to comply with the USACE Directive to remove and replace the masonry work. Dkt. No. 272-20 at 2. STM asserted that the original work met the contract requirements and argued that removal and replacement was unnecessary. Dkt. No. 27-20 at 1.

Tetra Tech forwarded this claim to USACE by letter dated April 19, 2010. Dkt. No. 272-21. Tetra Tech noted that it had arranged a substitute contractor to perform the work beginning the following week, but stated it would place that work on temporary hold pending USACE's response (including as to whether it would extend the time for compliance until after the claim was decided). *Id.* This letter was copied to STM and NASIC. *Id*. at 3.

On May 3, 2010, Tetra Tech again wrote to STM and NASIC, noting receipt of letters from STM and NASIC's counsel dated April 30, 2010, and responding to various arguments in those letters. Dkt. No. 272-18. For example, Tetra Tech noted that STM's statement that it was "not refusing to perform the work," was "disingenuous" in light of STM's ongoing failure to begin work as required by the USACE Directive unless paid additional sums. *Id.* at 2. Tetra Tech reminded STM and NASIC that STM did not have a contractual right to refuse to do the work pending resolution of its claim for additional payment. *Id.* It also responded to STM and NASIC's arguments that the decision requiring the removal and replacement of the brick veneer was not a "final decision," noting USACE's repeated reaffirmation of its Directive and the necessity for Tetra Tech to comply. *Id.* at 3. As to STM's pending claim for additional funds to remove and replace the brick veneer, Tetra Tech noted that, if it was rejected, Tetra Tech would "take the steps necessary to file an appeal with the Federal Court of Claims[.]" *Id.* Tetra Tech reminded STM and NASIC that it had already given them notice (through the prior week's letter) that it planned to complete the work, and again advised them that "the replacement subcontractor is planning to start

6

demolition work the week of May 10 or May 17." *Id.*  Tetra Tech advised both that they were free to observe the process in order to protect their interests in proving the degree of any defects.

On May 5, 2010,[3] STM responded to Tetra Tech's  "letters of April 30, May 3 and May 5, 2010[.]" Dkt. No. 272-22.  STM argued that it was not obligated to perform the work because there was no "final decision" binding on Tetra Tech or STM.  It argued that the USACE Directive was not such a decision and suggested that the proper course was for Tetra Tech to pay STM for the additional work, leaving Tetra Tech to seek compensation through a claim.  *Id.* (asserting that this approach would put Tetra Tech in no worse position than its intended course of hiring a replacement subcontractor to do the work).  STM expressed concerns, despite Tetra Tech's statement that it was free to observe the process, that using a replacement subcontractor would "prejudic[e] STM by not allowing it to perform the work and demonstrate that the already performed work is acceptable." *Id.*; *see also id*. at 3 (indicating a need to inspect as the work is performed).  STM referred to a recent response from USACE regarding the claim which stated "'you are to proceed diligently with performance under the contract,'" and stated "this does not appear to be a directive to begin work immediately."  *Id*. at 3.  In this same letter, STM conceded its then-pending claim should be withdrawn because Tetra Tech was "not allowing STM to perform the work" thus defeating STM's right to pursue a claim.  *Id.*  (suggesting Tetra Tech would have to pursue its own claim for the additional work, and stating that because STM would not be allowed to participate in the legal process because it was not being allowed to perform the work, "any final decision . . . against [Tetra Tech] will not be binding on STM.").

---

[3]  The letter is undated, but facsimile sheets indicate it was sent to Tetra Tech via facsimile on May 5, 2010.  Dkt. No. 272-22 at 6.

The work was, ultimately, completed by a replacement subcontractor. Tetra Tech filed this action seeking to recover the costs of hiring the replacement subcontractor as well as various consequential and incidental damages. Although Tetra Tech initially pursued multiple theories of recovery, it now seeks recovery only for breach of contract based on STM's Subcontract and NASIC's surety bond (which incorporated the Subcontract) .

## SUBCONTRACT TERMS

The Subcontract includes the following provisions of particular relevance to the cross motions for summary judgment.

### II.     COMPENSATION

. . . Contractor is not obligated to compensate Subcontractor beyond the amount stated and Subcontractor will be compensated only for work properly performed and accepted.

Subcontract § II, Art. II (Dkt. No. 272-2 at 6).

> **4.     STANDARD OF CARE.** Subcontractor warrants that Subcontractor and its employees shall, in performing Work hereunder, exercise the degree of skill, care and diligence consistent with the highest industry standards and perform Work in accordance with any and all drawings, specifications or requirements provided by Contractor, and that such Work will be suitable for the purposes intended. *Should Subcontractor fail to perform to those standards, it shall (a) without cost to Client or Contractor, reperform and correct any substandard Work, and (b) reimburse Contractor for Contractor's direct, incidental, consequential or other costs resulting from or arising in connection with the breach of such warranty.* If Subcontractor fails to replace or correct any such Work after reasonable notice, but in no event after three days following receipt by Subcontractor of such notice from Contractor, Contractor may, at its sole option, cause such Work to be replaced or corrected and all costs and expenses incurred in connection therewith shall be borne by Subcontractor.

Subcontract § III, Art. 4 (emphasis added).

> **12.     DISPUTES.** If any claim, controversy or dispute of any kind or nature whatsoever arises between the Contractor and Subcontractor and such dispute cannot be settled through negotiation, then any dispute shall be determined in appropriate

8

legal proceedings, first through non-binding Alternative Dispute Resolution proceedings, if agreed to by the parties, then, if necessary, in a court of law . . . .

*Pending the resolution of any dispute under this Subcontract, the Subcontractor shall proceed as directed by written notice from the Contractor.* Subcontractor shall not permit any Disputes under this Subcontract to affect any other Subcontract in place with Contractor or other Work being performed by Subcontractor.

*If a decision relating to the Prime Contract is issued by the Client under the Prime Contract and the decision relates to the Subcontract, said decision, if binding upon Contractor under the Prime Contract shall also be binding upon Contractor and Subcontractor with respect to such matter.* In the event that any Change arises out of or is caused by action or inaction of the Client, and provided (I) that due notice as required hereunder has been given and (ii) that Contractor believes the request is reasonable and made in good faith . . . Contractor shall pass Subcontractor's request for adjustment through to Client for resolution. The decision of the Client with respect to any such request shall be final and binding on Subcontractor and the Change, if any, actually agreed to by Client . . . shall constitute Subcontractor's sole and exclusive remedy, and Subcontractor shall make no claim against Contractor, in connection therewith.

If any Client decision or judgment is binding upon Contractor and Subcontractor, and Contractor is unable to obtain reimbursement from the Client under the Prime Contract for, or is required to refund or credit any amount with respect to any item of cost or fee for which Contractor has reimbursed Subcontractor, the Subcontractor shall, on demand, promptly repay such amount to Contractor. Contractor's maximum liability for any matter connected with or related to the Subcontract, which was properly the subject of a claim against the Client under the Prime Contract, shall not exceed the amount of Contractors recovery from the Client.

In order to induce Contractor to pass through Subcontractor's request to Client, Subcontractor shall with each such request provide a certification signed by an officer stating as follows: "I certify that the claim is made in good faith; that the supporting data are correct accurate and complete to the best of my knowledge and belief; that the amount requested accurately reflects the contract adjustment for which the Subcontractor believes the Client is liable; and that I am duly authorized to certify the claim on behalf of the Subcontractor."

Subcontract § III, Art. 12 (emphasis added).

16.    **GOVERNING LAW.** This Subcontract shall be governed by the laws of the State of New Jersey, excluding any conflicts of law provisions. Subcontractor shall promptly pay and reimburse Contractor for all costs, expenses, damages, reasonable attorney's fees incurred by Contractor which arise out of the performance or non-performance by the Subcontractor and/or the enforcement of the terms,

9

conditions or obligations of the Subcontract or any bond . . . furnished in connection therewith.

Subcontract § III, Art. 16.

> **17.    AMENDMENT AND NON-WAIVER.** . . . *Payment of any sum by Contractor to Subcontractor with or without the knowledge of any breach shall not be deemed to be a waiver of any such breach or any other breach*, nor shall such payment constitute an acceptance of the Work not in accordance with this Subcontract nor relieve Subcontractor of its obligations hereunder.

Subcontract § III, Art. 17 (emphasis added).

> **22.    INSPECTION.** *Subcontractor shall provide and maintain an inspection system covering the Work . . . to be furnished under this Subcontract.* Records of such system shall be maintained and available to Contractor and/or Client. Contractor and/or Client shall have the right to inspect any Work furnished by Subcontractor and may reject or require reperformance of any Work not performed in accordance with the requirements set forth herein. *If any Work or portion thereof is determined to be unsuitable, defective or in violation of any law, rule or regulation . . . Subcontractor shall bear and pay all expenses incidental to the correction of unsuitability and/or correction of such Work[.]*

Subcontract § III, Art. 22 (emphasis added).

> **24.    RIGHT TO RELY.** Contractor shall be entitled to rely without independent verification on the accuracy, currency and completeness of information supplied by Subcontractor.

Subcontract § III, Art. 24.

## DISCUSSION

Defendants STM and NASIC have filed separate motions, each seeking summary judgment on different grounds. Plaintiff Tetra Tech has filed a motion for partial summary judgment. The court addresses these motions below, beginning with Defendants' motions.

## I.    NASIC'S MOTION FOR SUMMARY JUDGMENT

NASIC argues that it is entitled to summary judgment, relieving it from any obligation on its surety bond, on three grounds. All three arguments are rejected for reasons addressed below.

### A.    Material Variation from Subcontract and Failure of Condition Precedent

10

Though based on distinct legal theories, NASIC's first two arguments are closely related as both rest on the premise that NASIC should be relieved of liability because Tetra Tech paid STM for defective work.[4]  NASIC first argues that such "improper payments" constitute a "material variation of the compensation provision of the masonry subcontract."  Dkt. No. 246-1 at 20. NASIC's second argument recasts such payments as a failure of a condition precedent.  Dkt. No. 246-1 at 26.  Both arguments rest on a sentence in Section II of the Subcontract which, under the heading "Compensation" states, in part, "Subcontractor will be compensated only for work properly performed and accepted."  Dkt. No. 272-2 at 6.  NASIC also relies on Flow Down clauses from the Prime Contract which provide that STM's work is  subject to inspection by Tetra Tech as well as evidence that Tetra Tech did inspect STM's work on various occasions but never noted the types of problems referenced in the USACE Directive.[5]

As Tetra Tech argues in response, NASIC's first and second arguments ignore the non-waiver provision of the Subcontract which reads, in relevant part, as follows:

> Payment of any sum by Contractor to Subcontractor with or without the knowledge of any breach shall not be deemed to be a waiver of any such breach or any other breach, nor shall such payment constitute an acceptance of the Work not in accordance with this Subcontract nor relieve Subcontractor of its obligations hereunder.

Subcontract § III, Art. 17.

---

[4]  STM had been paid roughly 99% of the contract price by late September 2009 – prior to the water intrusion which, ultimately, led to USACE's directive to remove and replace the brick veneer.  NASIC argues that, if STM's work was so defective as to require such a drastic remedy, the payment of virtually the entire contract price was necessarily payment for defective work.

[5]  The Flow Down provisions of the Prime Contract were incorporated into the Subcontract which, in turn, was incorporated into NASIC's surety bond.

NASIC's arguments also assume that the purpose of the inspection rights in the Flow Down provisions is, at least in part, for STM's protection. There is, however, no support for this assumption as the normal intent of a right of inspection is for the benefit of the Client (or Contractor when substituted for the Client by virtue of the Flow Down provisions). Construing the right of inspection as intended for the benefit of the Client (or Contractor) is also consistent with the non-waiver provision found in the Subcontract. Any other interpretation would place the two provisions at odds.

It follows that Tetra Tech's payments to STM for work which closer inspection might have shown to be defective was not a material variation from the compensation provisions of the Subcontract. Neither could any failure to adequately inspect STM's work constitute a failure to satisfy *a duty owed to STM*. It follows that any inadequacy in Tetra Tech's inspections did not constitute a failure of a condition precedent to performance of the bond.

The court rejects NASIC's first two arguments in favor of summary judgment for the reasons set forth above. Given this rejection, the court need not address Tetra Tech's additional arguments in opposition. The court, nonetheless, notes its agreement with Tetra Tech that, even if the law and contract language supported NASIC's arguments, there would be genuine issues of material fact as to what inspections Tetra Tech should have performed and what it should have discovered had it performed those inspections.

### B.      Timeliness of Declaration of Default and Notice

As a third basis for summary judgment, NASIC argues Tetra Tech is barred from recovery under the bond because it failed to declare default at a sufficiently early point that NASIC would

have had a meaningful opportunity to cure.  NASIC also argues that Tetra Tech failed to give reasonable notice of its intent to arrange performance by a replacement subcontractor.

The first aspect of NASIC's third argument suggests that Tetra Tech had a duty to declare a default based on the defective nature of STM's work before that work was complete (*i.e.* at a time when remedying the defects would not have required complete tear down and replacement of the brick veneer).  *See* Dkt. No. 246-1 at 32.  This is, in effect, an argument that Tetra Tech owed a duty of inspection to STM and, by extension, to NASIC.  As explained above, however, Tetra Tech owed no such duty to STM or, by extension, to NASIC.[6]

The second aspect of NASIC's third argument appears to rely on the time gap between when the water intrusion was first discovered (November 2009), and one of the following dates: (1) January 29, 2010, when Tetra Tech sent Notice of Cure letters to NASIC and STM (Dkt. Nos. 272-13, 272-14); (2) February 4, 2010, when Tetra Tech sent NASIC notice that it was holding STM in default (Dkt. No. 272-15); (3) March 30, 2010, when Tetra Tech again declared STM in default after USACE rejected STM's further efforts to obtain relief from the USACE Directive (Dkt. No. 272-16); or (4) May 3, 2010, when Tetra Tech responded to letters from STM and NASIC's counsel and "again notified [both that] the replacement subcontractor [was] planning to start demolition work" within the next two weeks (Dkt. No. 272-18).  To whatever extent NASIC relies on any "delays" during this period, its argument is ill founded.  Most critically, from November 2009 to late January 2010, when USACE issued its Directive to remove and replace the brick veneer, STM was working with Tetra Tech in preparing the CAP to address the problem.  During this period, STM indicated

---

[6] If Tetra Tech had such a duty, it would, presumably, have been obligated to advise STM of the problems and demand that STM remedy them.  If STM refused to remedy the problem, then Tetra Tech might have declared a default and placed NASIC on notice of that default.

a willingness to do whatever work was required under the CAP. Thus, there was no default or threatened default during this period.

It was only after USACE rejected the CAP and issued its Directive that it became apparent USACE would insist on a remedy which was beyond what STM was willing or able to perform. This Directive was issued on January 25, 2010. Dkt. No. 272-12. On January 29, 2010, Tetra Tech sent notices to both NASIC and STM regarding STM's (then only potential) default. Dkt. Nos. 272-13, 272-14. Thereafter, Tetra Tech worked with STM in trying to persuade USACE to accept a less expensive remedy. *See supra* at 3-7 (summarizing correspondence and meetings between January 2010 and May 2010). Tetra Tech also communicated frequently with NASIC during this period, keeping it informed of these efforts (and their repeated failure) either by letter directed to NASIC or by copying it on correspondence to STM. *Id.*

Tetra Tech's communications included several advising NASIC that it was obtaining a replacement subcontractor. Dkt. Nos. 272-17 (April 6, 2010 letter to STM, copied to NASIC); 272-21 (April 19, 2010 letter to USACE, copied to NASIC); 272-18 (May 3, 2010 letter to NASIC and STM). Nothing in these circumstances suggests Tetra Tech failed to give NASIC timely notice either of STM's default or Tetra Tech's intent to arrange completion of the work itself if STM and NASIC failed to assume responsibility for the task. Thus, NASIC is not entitled to summary judgment based on any failure of timely notice of STM's default.

C.     **Conclusion as NASIC's Motion**

For the reasons set forth above, NASIC's motion for summary judgment is denied.[7]

_____

[7] In light of this determination, the court need not reach Tetra Tech's additional arguments in favor of summary judgment.

14

## II.     STM'S MOTION FOR SUMMARY JUDGMENT

In its separate motion for summary judgment, STM argues that it is entitled to "summary judgment [because] Tetra Tech breached the subcontract by failing to obtain a final decision pursuant to Article 12 of the subcontract and to protect [STM's] right to pursue an appeal."  Dkt. No. 247-1 at 3.  As Tetra Tech notes in response, this argument fails to support summary judgment for a variety of reasons including that it fails to "discuss the effect of the alleged breach or explain how such a breach would obviate STM's liability . . . in light of its [own] contractual obligations." Dkt. No. 268 at 1.

Both aspects of this argument turn on interpretation of Article 12, which is made up of five distinct paragraphs.  Subcontract § III, Art. 12 (quoted in full *supra* at 8-9).  The first paragraph addresses how disputes between the Contractor (Tetra Tech) and Subcontractor (STM) will be resolved.  The second addresses the Subcontractor's obligation, "pending . . . resolution of any disputes" to "*proceed as directed by written notice from the Contractor.*"  The third paragraph addresses decisions by the Client (as opposed to directives from the Contractor), and provides that the Client's decisions are binding on the Subcontractor to the same extent that they are binding on the Contractor (with respect to work covered by the Subcontract).  This paragraph also allows a Subcontractor to submit requests for adjustments to the Client through the Contractor.  The fourth paragraph limits the Contractor's liability to the Subcontractor and requires the Subcontractor to repay the Contractor if the Contractor has advanced funds which are later disallowed based on a Client decision.  The fifth and last paragraph requires a specific certification by the Subcontractor to "induce" the Contractor to pass on the Subcontractor's requests for adjustment.

Nothing in these paragraphs precludes Tetra Tech from directing STM to complete work, including remedial work, prior to obtaining a "binding decision" from the Client as to any disputed matter (including a request for an adjustment). To the contrary, the plain language and multi-paragraph structure of Article 12 compel the conclusion that STM was required to comply with Tetra Tech's written notice directing it to perform work pending a decision on any dispute regarding what work should have been required under the Subcontract or any related request for adjustment.

In the present case, Tetra Tech was faced with the USACE Directive which required, *inter alia*, removal and replacement of the brick veneer. This Directive followed unsuccessful attempts by Tetra Tech, STM, and other subcontractors to persuade USACE to accept a less expensive remedy as set out in the CAP. Tetra Tech was also faced with liquidated damages which were accruing at a rate in excess of $2,000 per day. Based on these considerations, Tetra Tech made a decision to direct STM to comply with the USACE Directive. Once Tetra Tech gave STM written notice of this decision, directing STM to complete specific work, which it did on multiple occasions, STM was required to comply.

In sum, Tetra Tech had no duty to "obtain a final decision pursuant to [the third paragraph of] Article 12" prior to directing STM to complete work pursuant to the second paragraph of Article 12. It follows that Tetra Tech did not breach the contract by directing STM to complete the work prior to filing any appeal which might have been available to it.[8]

---

[8] For purposes of resolving STM's motion, the court will assume without deciding that Tetra Tech could have elected to pursue a "binding decision" from some appellate body before complying with the USACE Directive without automatically being held in default. Even with this assumption, STM's argument would fail as there is no support for the conclusion that Tetra Tech was *obligated* to pursue such a course. Instead, as the Contractor, Tetra Tech had the right to make the decision

16

Had STM complied with Tetra Tech's written notice and performed the work as directed, it might have submitted a request for adjustment or "claim" to the extent it believed the rework directive was beyond the scope of the Subcontract. By failing to do the work, STM waived any right to make such an "appeal" on its own behalf. Thus, after declining to perform the work as directed, STM had no "right to pursue an appeal" which Tetra Tech might have protected. It follows that STM is not entitled to summary judgment based on Tetra Tech's alleged failure to "protect [STM's] right to pursue an appeal."

For the reasons set forth above, STM's motion for summary judgment is denied.[9]

## III.    TETRA TECH'S MOTION FOR SUMMARY JUDGMENT

Tetra Tech seeks partial summary judgment as to its claim for breach of contract against STM and with respect to a number of affirmative defenses asserted by STM and NASIC. These arguments are addressed below.

### A.    STM Breached the Subcontract as a Matter of Law

Tetra Tech argues that STM breached the Subcontract as a matter of law when it refused to comply with Tetra Tech's directive to complete the work. Tetra Tech relies, specifically, on the following language from Article 12 of the Subcontract:

_____

on the course to pursue. The decision it made was, in any event, not unreasonable given the risks of non-compliance (including the continuing accrual of liquidated damages, loss of the right to seek an adjustment for completed work, and risk of being held in default), particularly when weighed against the opportunity to seek an adjustment if the work turned out to be more than was necessary. The latter determination would, presumably, take into consideration information gained in the process of performing the remedial work which would have opened up otherwise hidden areas for inspection.

[9] In light of this determination, the court need not reach Tetra Tech's additional arguments in favor of summary judgment.

    **12.**    **DISPUTES.**  If any claim, controversy or dispute of any kind or nature whatsoever arises between the Contractor and Subcontractor and such dispute cannot be settled through negotiation, then any dispute shall be determined in appropriate legal proceedings, first through non-binding Alternative Dispute Resolution proceedings, if agreed to by the parties, then, if necessary, in a court of law . . . .

*Pending the resolution of any dispute under this Subcontract, the Subcontractor shall proceed as directed by written notice from the Contractor.*  Subcontractor shall not permit any Disputes under this Subcontract to affect any other Subcontract in place with Contractor or other Work being performed by Subcontractor.

If a decision relating to the Prime Contract is issued by the Client under the Prime Contract and the decision relates to the Subcontract, said decision, if binding upon Contractor under the Prime Contract shall also be binding upon Contractor and Subcontractor with respect to such matter.  In the event that any Change arises out of or is caused by action or inaction of the Client, and provided (I) that due notice as required hereunder has been given and (ii) that Contractor believes the request is reasonable and made in good faith . . . Contractor shall pass Subcontractor's request for adjustment through to Client for resolution.  The decision of the Client with respect to any such request shall be final and binding on Subcontractor and the Change, if any, actually agreed to by Client . . . shall constitute Subcontractor's sole and exclusive remedy, and Subcontractor shall make no claim against Contractor, in connection therewith.

Subcontract § III, Art. 12 (emphasis added).

    As Tetra Tech notes, STM's agents conceded that STM could be required to re-perform any substandard work without further compensation.  Torbett dep., p. 39, ln. 25- p. 40, ln.5; Temples dep. at p. 100, lns 1-9; p. 106, lns 20-25.  STM's agents also conceded that there was a dispute regarding the directive to remove and replace the brick veneer.  *See*, *e.g.,* Temples dep. at p. 89, lns 20-24.  In addition, STM's agents conceded that, in the face of such a dispute, STM was required to perform the work and, absent agreement regarding payment, proceed under the disputes clause of the Subcontract (Article 12).  Torbett dep. at p. 42, ln. 6 - p. 43, ln. 7.  Despite understanding these obligations, STM never agreed to remove and replace the brick veneer.  Temples dep. at p. 91, lns 12-22.

18

For purposes of Tetra Tech's argument, the critical sentence of the Subcontract reads as follows:  "Pending the resolution of any dispute under this Subcontract, the Subcontractor shall proceed as directed by written notice from the Contractor."  Subcontract §III, Art. 12.  Together with the documentary evidence, STM's concessions establish that STM received written notice from Tetra Tech directing it to remove and replace the brick veneer and failed to comply with that directive. *See, e.g.,* Dkt. No. 272-14 (Notice of Cure letter dated January 29, 2010).  These facts establish that STM breached its contractual duties.

STM's opposition argument that it was not required to comply because there was no "final decision" regarding the work to be done does not change this result for reasons addressed in the prior section and as further addressed here.  *Supra* § II (addressing STM's motion for summary judgment).  First and foremost, the language on which STM relies is in a distinct paragraph regarding decisions by the Client, the same paragraph which addresses STM's right to pursue a claim for additional compensation if required to do work beyond that covered by the Subcontract. The relevant sentence reads as follows: "If a decision relating to the Prime Contract is issued by the Client under the Prime Contract and the decision relates to the Subcontract, said decision, if binding upon Contractor under the Prime Contract shall also be binding upon Contractor and Subcontractor with respect to such matter."  This sentence presumably makes any decision on a request for adjustment by the Contractor binding on the Subcontractor, just as it would make any other decision relevant to a subcontract binding on the Subcontractor.  It cannot, however, be read to relieve the Subcontractor of the obligation to comply with a written directive from the Contractor (as required by the second paragraph of the same Article)  if the Subcontractor disagrees with that directive (or an underlying, though arguably not final, "decision" of the Client which motivated the Contractor

to issue its written directive). To read the third paragraph as STM suggests would render the second paragraph's clear directive to proceed with work as directed in writing by the Contractor pending resolution of any disputes meaningless.[10]

---

[10] In light of this conclusion, the court need not reach Tetra Tech's other arguments regarding the meaning of the term "decision" found in the third paragraph of the relevant Article.

**B.     There Is No Evidence that Tetra Tech failed to Mitigate Its Damages by Failing to Pursue an Appeal or Claim**

Tetra Tech moves for summary judgment on STM's failure to mitigate defense.  Through this defense, STM argues that Tetra Tech failed to mitigate its damages by failing to pursue contractual rights and remedies against USACE.[11]  For the reasons set forth below, Tetra Tech's motion is granted as to this defense.

In opposing summary judgment on its failure-to-mitigate defense, STM focuses on Tetra Tech's alleged *impairment of STM's right to pursue a claim.  See* Dkt. No. 269 at 5-6 ( noting that the "subcontract required Tetra Tech to pass [STM's] claim through to USACE for resoultion" then arguing that, by hiring a replacement subcontractor, "Tetra Tech failed to preserve [STM's] claim" and "prevented [STM] from contesting a breach of the standard of care"); *id.* at 6 (arguing that "[t]he evidence that Tetra Tech failed to permit [STM] an opportunity to contest its claim creates at least a question of fact as to whether [Tetra Tech ] failed to mitigate its damages").  Even if factually

---

[11]  This affirmative defense is worded identically in each of the three answers filed by STM, and reads, in full, as follows:

FOR A SECOND DEFENSE
(Failure to Mitigate Damages)

26.  The Defendant, STM, repeats and realleges the matters set forth in the preceding paragraphs as fully as if said matters were set forth here verbatim.

27.  The Plaintiff has failed to mitigate damages as required by law.  In among other ways, Tetra Tech failed to mitigate damages by failing to pursue its contractual rights and remedies against the US Government.

*See* Dkt. No. 50, 84, 174 at ¶ 27.

21

supported, which it is not, this argument would not support a *defense* of failure to mitigate because it does not address Tetra Tech's duty to minimize *its own* damages.[12]

As no other argument is offered in support of the mitigation defense, the court grants Tetra Tech's motion for summary judgment with respect to this affirmative defense.[13]

### C.     There Is No Evidence of Waiver, Estoppel, or Laches

Tetra Tech argues that there is no evidence in support of STM's asserted affirmative defenses of waiver, estoppel and laches. *See* Dkt. No. 248 at 26-27 (setting forth elements of each defense and noting the lack of evidence to support those elements). Stripped of its introductory and concluding sentences, STM's response to this argument reads, in full, as follows:

> The evidence indicates that Tetra Tech mooted [STM's] ability to contest USACE's directive by hiring another contractor to remove and replace [STM's] work. [STM] should not be prevented from arguing that, due to [Tetra Tech's] actions, its claims against [STM] may be barred or limited through the doctrines of waiver and estoppel.

Dkt. No. 269 at 6-7. This minimal argument fails to explain how Tetra Tech's actions satisfy the elements of waiver or estoppel and makes no mention of laches.

---

[12] There is no support for the argument that Tetra Tech impaired STM's right to file a claim by hiring another subcontractor. STM lost its right to file a claim because it declined to do the work, even after repeated efforts by Tetra Tech to persuade STM to do so. Moreover, had Tetra Tech not hired a replacement subcontractor, it would likely have incurred greater damages as a result of STM's default. It follows that hiring a replacement subcontractor *was an act in mitigation*, not evidence of failure to mitigate.

[13] STM does not argue what is predicted by the actual language of the defense (quoted *supra* n. 11): that Tetra Tech failed to mitigate by failing to pursue its own rights and remedies against the Client. Such an argument would, in any event, fail as there is no contractual or other basis for imposing a duty on Tetra Tech to mitigate its damages by pursuing a request for adjustment or other claim against the Client.

Moreover, to the extent STM's ability to contest the directive was "mooted," it was as a result of STM's decision not to abide by the terms of the Subcontract, that is, to do the work as directed in writing by Tetra Tech. Tetra Tech's action in hiring a replacement subcontractor merely prevented Tetra Tech from breaching the Prime Contract which would, likely, have resulted in a far greater loss.

In short, STM has abandoned laches as a defense and has failed to direct the court to any evidence in support of waiver or estoppel. Tetra Tech's motion for summary judgment as to these three defenses is, therefore, granted.

### D.    Contributory Negligence and Assumption of the Risk Are Not Defenses to the Remaining Claim

Tetra Tech moves for summary judgment on STM's contributory negligence and assumption of the risk defenses based on Tetra Tech's dismissal of its claim for negligence (leaving only a claim for breach of contract). STM does not address this aspect of Tetra Tech's summary judgment motion in its response. In any event, contributory negligence and assumption of the risk are not defenses to a breach of contract claim. Tetra Tech's motion is, therefore, granted with respect to these two defenses.

### E.    NASIC's Defenses

**Non-Performance.** Tetra Tech first argues that it is entitled to summary judgment on NASIC's "non-performance" defense to the extent NASIC relies on Tetra Tech's withholding of a small portion of the contract price. In its opposition memorandum, NASIC identifies this defense as its fourth affirmative defense and concedes that Tetra Tech is entitled to summary judgment on this defense *to the extent it rests on any non-payment of the contract price*.

23

NASIC argues, nonetheless, that the defense should survive to the extent it rests on allegations "Tetra Tech has failed to perform *other* obligations under the Subcontract, including those obligations contained in the Compensation provision of the Subcontract. This argument fails for the same reasons that the court denied NASIC's motion for summary judgment on the same point: Tetra Tech did not owe STM (or, by extension, NASIC) a duty to inspect work prior to making payment.

**Economic Waste.** Tetra Tech also seeks summary judgment on NASIC's affirmative defense that the damages sought were "unnecessary and wasteful." Dkt. No. 248 at 28-32. Tetra Tech characterizes this defense as an "economic waste" argument under New Jersey law and argues that such a defense is neither supported by the facts of this case nor permitted under the terms of the Subcontract.[14]

As to the first point, Tetra Tech argues that "New Jersey law does not require damages to be limited under the doctrine of economic waste merely because the repair costs at issue exceed the property's diminution in value." Dkt. No. 248 at 30 (also noting that, "even in cases where diminution of value is the measure of damages, the jury is free to consider repair costs in determining that amount"); *id.* (noting that, "[i]n this case, the cost of the repairs was not disproportionate to the total value of the . . . buildings"). As to the second point, Tetra Tech notes that the Subcontract explicitly defined the rights of the parties with respect to repairs required by the Client, and that the explicit terms of the contract override any inconsistent common-law defense. *Id.* at 32 (noting Articles 4 and 12 of the Subcontract (1) require STM to remedy any work which

---

[14]  Pursuant to its choice-of-law provision, the Subcontract (which is incorporated into NASIC's surety bond) is governed by the laws of the State of New Jersey (exclusive of conflicts of law provisions). Subcontract § III, Art. 16 ("Governing Law").

fails to comply with the specifications of the project and highest industry standards and (2) provide specific and limited remedies, including allowing STM to submit a claim for work it believes was beyond what was required by the Subcontract).

In its opposition memorandum, NASIC identifies this defense as its twelfth affirmative defense and argues that summary judgment should be denied for two reasons. Dkt. No. 276 at 6-7 (summarizing arguments). First, NASIC argues that "the measure of recovery provided in NASIC's performance bond is 'the reasonable cost of completing performance of the subcontract,' after crediting 'the balance of the subcontract price.'" *Id.* at 7. With respect to this argument, NASIC suggests that there is a genuine issue of material fact whether a less costly means of remedying the problem (such as the CAP) would have sufficed. *Id.*; *see also id.* at 18-21 (more detailed argument). Second, NASIC argues that there is a genuine issue of material fact as to whether the demand for rebricking was "unreasonable, unnecessary and wasteful." *Id.* at 7. As to this second argument, NASIC asserts that, "[i]f the trier of fact determines that the remedy demanded . . . was, in fact, unreasonable, unnecessary and wasteful, the court should decline to enforce the Subcontract provision which Tetra Tech contends requires performance of the Rebrick Work." *Id.*; *see also id.* at 21-26 (more detailed argument).

In its more detailed discussion of the second argument, NASIC asserts that its twelfth "affirmative defense is supported by a policy argument relied on by New Jersey Courts as a basis for declining to enforce subcontract provisions which are void as against public policy." *Id.* at 23. In support of this argument, NASIC relies on *Saxon Const. & Management Corp. v. Masterclean of N.C., Inc.*, 641 A.2d 1056 (N.J. Super. A.D. 1994) which held a remedial provision in a

subcontract void as against public policy in part because it discouraged contractors from affirmatively seeking to minimize their losses.

The subcontract at issue in *Saxon* provided as follows in the event the subcontract was terminated: "If the unpaid balance of the Contract Sum exceeds the expense of finishing the Work, such excess shall be paid to the Subcontractor, but if such expense exceeds such unpaid balance, the Subcontractor shall pay the difference to the Contractor." *Saxon*, 641 A.2d at 1058.  In the context of a claim by a defaulting subcontractor for reimbursement of the unpaid balance which exceeded the expense of finishing the work, the court held the provision unenforceable as a matter of public policy because it (1) encouraged the subcontractor to breach the contract if it knew the services could be purchased for less than the agreed price; (2) provided the defaulting subcontractor with a windfall; and (3) discouraged contractors from affirmatively seeking to minimize losses resulting from a breach. *Id.* at 1059.  The court concluded that "[a] contractual term that rewards a defaulting party by placing it in a better pecuniary position than it would have been had it performed its promise defeats common sense and encourages unreasonable economic waste." *Id.* at 1059.

On reply, Tetra Tech argues that NASIC is improperly attempting to assert a new affirmative defense by recharacterizing its twelfth affirmative defense as an argument that the relevant provision of the Subcontract is void or unenforceable for public policy reasons – an argument which is not

predicted by the answer.[15]  Tetra Tech further argues that, even if allowed, the defense would not

be applicable to the facts of this case.  The court agrees with Tetra Tech on both points.

NASIC filed its Answer to the Amended Complaint on January 18, 2011.  Dkt. No. 50.

Nothing in that answer suggests that NASIC is challenging any provision of the Subcontract as void

or unenforceable under New Jersey law.  The deadline for amending pleadings expired on January

10, 2011 (Dkt. No. 41), although it was extended for limited purposes to July 15, 2011 (Dkt. No.

169).  NASIC has not, even now, sought to amend its answer (which would, at the least, require a

strong showing of good cause given the timing).  For all of these reasons, the court will not allow

NASIC to argue that any aspect of the Subcontract is unenforceable or void under New Jersey law.

Even if the argument were not untimely, it would be rejected for reasons argued in Tetra Tech's

motion as the remedial provisions in the Subcontract do not discourage a contractor from seeking

to minimize expenses after a subcontractor's default.[16]

---

[15]  NASIC's twelfth affirmative defense reads, in full, as follows:

72. The costs allegedly incurred by the plaintiff, for which it seeks recovery, were
unreasonable, unnecessary and wasteful.
73. By reason of the foregoing, the Amended Complaint should be dismissed as
against NASIC.

Dkt. No. 50.

[16]  The remedial provisions of the Subcontract required STM (or NASIC when called on to
cure STM's default) to move forward expeditiously to complete work required by the Subcontract,
including the remedial work which Tetra Tech required STM to perform through a written directive.
The Subcontract balances this requirement with a procedure through which STM (or NASIC if it
had arranged substitute performance) could have sought additional compensation if the work was
beyond what should have been required under the Subcontract.  Nothing in this pairing of rights and
obligations is likely to lead to waste as a directive to perform work beyond what is required under
the Subcontract may require additional compensation.
    When STM and NASIC failed to complete the work as directed by Tetra Tech, the latter was
forced to arrange substitute performance for which Tetra Tech bore the initial financial obligation.

Stripped of NASIC's untimely recharacterization of this defense, it is left with an argument that the jury should decide "whether Tetra Tech's demand for the performance of the Rebrick Work and the costs incurred to perform that work were, in fact, unreasonable, unnecessary and wasteful." Dkt. No. 276 at 24. The difficulty with this argument is that the Subcontract provided a limited remedial scheme which NASIC elected not to pursue. That is, NASIC could have (and was encouraged to) step in and perform the work or arrange its performance. Had it done so, NASIC, like STM, could have sought an adjustment based on its argument that the requirement to do the work was excessive. Nothing in the Subcontract suggests that NASIC (standing in STM's shoes) may ignore a directive to perform work and then challenge Tetra Tech's decision to perform the work.[17]

---

Although Tetra Tech was then entitled to pursue recovery from STM and NASIC, it had no assurance that it would be able to recover all of its expenses and, in any event, faced the delay and expense of litigation in order to recover those amounts. Nothing in this scenario would have discouraged Tetra Tech from minimizing its expenses or would otherwise have encouraged waste.

In any event, under the facts of this case, it is clear Tetra Tech worked with STM in encouraging the Client to accept a less expensive alternative remedy. When the Client rejected the proposed alternative, Tetra Tech had little or no choice but to follow the Client's directive. Any other course could easily have led to even greater damages given the accrual of daily liquidated damages and potential that Tetra Tech would have been held in default.

[17] It is possible to construe NASIC's argument as challenging both the reasonableness of the decision to require the rebricking work and the reasonableness of the price paid the replacement subcontractor. NASIC's argument, however, focuses solely on the first point, suggesting the latter is not at issue. *See* Dkt. No. 276 at 24 (arguing the "court should decline to enforce Article 12 . . . to the extent that it required STM to perform unreasonable, unnecessary and wasteful work, which would have led to its financial ruin"); *id.* a 25 (arguing court should decline to enforce Article 12 "[i]f the trier of fact determines that the Rebrick Work was unreasonable, unnecessary, and wasteful" and that enforcing Article 12 "without regard to the reasonableness of the remedy demanded by Tetra Tech" would violate New Jersey law). This interpretation is further supported by NASIC's failure to point to any evidence that the price paid to the replacement subcontractor was unreasonable for the work performed. The court, therefore, construes NASIC's twelfth affirmative defense as addressed solely to the reasonableness of the work required.

28

## CONCLUSION

For the reasons set forth above, Defendants' motions for summary judgment are DENIED and Plaintiff's motion for partial summary judgment is GRANTED. In granting Plaintiff's motion, the court holds that STM breached the subcontract as a matter of law, and rejects the following affirmative defenses as a matter of law: (1) STM's failure to mitigate defense, (2) STM's waiver, estoppel, and laches defenses, (3) STM's contributory negligence and assumption of the risk defenses, (4) NASIC's fourth affirmative defense (alleged non-performance by Tetra Tech), and (5) NASIC's twelfth affirmative defense (economic waste).

IT IS SO ORDERED.

s/ Cameron McGowan Currie
CAMERON MCGOWAN CURRIE
UNITED STATES DISTRICT JUDGE

Columbia, South Carolina
February 3, 2012

29